Please the Court, Don Howarth and Suzelle Smith for the appellant Chandler. There are three issues that are undisputed that I just want to get out on the table but push to the side at the outset. This is a de novo review. There's no deference here to the judge below. We agree on that. The question here is what the Supreme Court of California would hold if presented with this situation. We agree on that. And this is a case of first impression. There is no California case. It's on point. It's discussed this particular situation. We agree on that. With those three things in mind and pushing them over, I want to make three or four points about why this court should look hard at what happened below and I believe reverse it and write an opinion substantiating this make whole rule here in California as I think the California Supreme Court would do. The first reason for that is that, and this was not recognized, I think, at least not in the opinion by the court below, and you see no answer to it in the brief on the other side, that the only issue here is an issue of disclosure. The case law is clear that a party can eliminate the effect, a party to an insurance contract, that is the insurer here, can eliminate or contract around, you can abrogate these make whole rights entirely by a clear plain agreement or provision since these are usually not individually negotiated, a provision in the insurance contract. If he does that, the make whole rule doesn't apply. So what all we're talking about here today is whether or not the insurer needs to say so clearly in his contract if he doesn't want to be bound by the make whole rule. It's a matter of whether or not a defendant like State Farm who doesn't say that should be treated the same as another insurer who comes forward with full disclosure to the policyholder and says, look, we're not going to pay over out of our indemnity to make you whole. If you say that, that's the end of it. And that's the most important reason why this case should be reversed because to do so would promote that full disclosure.  The second reason the Court should reverse it is that it would not allow an insurance company to do this without disclosing it to a policyholder who's not going to be thinking about the make whole rule and entering one of these. The second reason the Court should reverse it. Well, if that's the simple answer that you wish, why didn't you just bring a cause of action in State court and not denominate it as a class action? We couldn't bring it in State court because of the diversity. And we wanted to bring it as a class action to represent. Remember, here his damages are $70 or so. So. Why couldn't you bring it in State court? That puzzles me. They're not a California corporation. State Farm isn't? No. But they do business here? They do business here. But in any event, we want more than just for this plaintiff. We wanted a class action. There's no dispute about jurisdiction being here. We would have brought it in State court if we could have brought a class action for this in State court. But we had to go into federal court. That's not before the court. What's implicated, though, is this disclosure rule. That the Court didn't appreciate below. And there's no answer in their brief because they say, well, wait a minute. We have in our brief a contract provision that says that we're entitled to our subrogation. That isn't the disclosure the Court's been talking about. To abrogate this rule, in addition to that, you have to say, we're not going to allow the make whole rule. We're not going to pay over. The make whole rule always invades their subrogation rights, which are subject to the make whole rule, unless they abrogate it. And they did not. So that's the key issue. And there was no comment on it below. The second misconception the Court had below was he felt there was going to be a danger of double recovery. Or a risk that the insured, the policyholder, I'll say, because otherwise they get insured and insurer confused. Or whatever comes out to say. That the policyholder would somehow have more than he would have from the insurance company. Double recovery. Or in total. That's not the case. By the rule that we urged, there would never be recovery of more than 100%. That is what the make whole rule is about. It doesn't say that. The make whole rule in California covers both the reimbursement concept and the subrogation concept. So if the. Are you talking 100% or are you talking about 100% of 80%? I'm talking about 100% of 100% here. In other words, he gets the 80%. Isn't that the problem? Because then the policyholder is actually getting more than he's bargaining for in policy. Well, in a sense. But that's always the operation of the make whole rule. And he bargained for that in the. The make whole rule, if it applies. They don't have any. Because the insurance company could care less how much he recovers from the tortfeasor. Well. So if he recovers what then aggregates to 100% of his out-of-pocket losses, despite the fact that the insurance policy only covers 80. Yeah. I mean, so what? To a state farm. I mean, it's bargained for 80%. And so has the policyholder. That's correct. To a state farm. That's correct. So it does invade their subrogation rights. But the make whole rule always takes a priority over their subrogation rights. They agree, for example, that if there are limited. There's a limited fund. That no matter their subrogation rights, before they collect anything on that, we get 100%. Sure, but that's a big if. I mean, because there's nothing here to show that had your client gone after the tortfeasor himself, rather than his insurance company, he wouldn't have paid the 60 bucks. I'm not saying that they have that kind of a limited fund here. I'm saying that the make whole rule, when it operates, always operates. The question doesn't operate here. If it operates, it operates to prevent the insurer, the policyholder, from getting its subrogation rights until the policyholder is made whole. It's 80% from his own insurer, and it's 20% from the tortfeasor or its insurer. No double recovery. Well, and the facts of this case, what I don't quite follow is did the plaintiff actually attempt to get the money back, get compensated from the tortfeasor? Yes, they did, and they said no. Before the insurance company did? No. The insurance company came in first, took the low-hanging fruit. Wait a second. I mean, that's not, we don't have to characterize them as, just the facts. So the insurance company, the Chandler submitted a claim to his insurance company. Paid him. Then his insurance company went to the insurance company for the tortfeasor and said, we want our subrogation rights. We stand in his shoes. No question. They do. They stand in his shoes. There's nothing wrong with that. Nothing wrong with that. We want this money. They received enough money on their claim, all the insurance company for the tortfeasor would pay, to make Chandler whole and leave them with some money. But they did not pass any of that over to Chandler. In other words, they … Well, do they have any obligation under the policy to do that? Not under the policy. Under the make-whole doctrine of California that says whatever the provision of the policy, unless you abrogate the make-whole doctrine, you don't come in line in front of your insurer. Your insurer has to be made, you're insured. See, I'm doing it again. You don't come in line in front of your policyholder. He has to be made whole first before you can exercise your subrogation rights. Or if you exercise them, you can't keep the money until he's made whole. The result here is the two insurance companies, back and forth, pay one another. His carrier, the insured here, the policyholder, gets his 80%. His insurance carrier gets some of their subrogation back, and he doesn't get made whole first. That's what the make-whole rule does. It says he's to be made whole before they can exercise their subrogation rights. So there's never a double recovery. The extra 20% is always coming from the tortfeasor or the tortfeasor's insured. The difference is that the policy writer, the insurer here, doesn't get to exercise his full subrogation rights. If the insurer here had not gone after the tortfeasor, then you wouldn't have a complaint. We wouldn't have any claim at all. The only reason we have a claim is because the insurance company went after the tortfeasor, recovered money, and is keeping it before we're made whole. That's the essence of the make-whole rule. Could you have joined that effort? Could I do what? Have joined that effort. Well, yes. Not that effort. We could have brought our own lawsuit. This was a settlement. It wasn't done in a court case. And, in fact, if both parties do bring a lawsuit, that is an exception in California to the make-whole rule. If they do, that's a recognized exception. The other one is by contract. Well, but the state courts of California also said in absence of a contract, they have really narrowed the make-whole rule. They have not expanded it outward. And what my concern is with the math from your client's point of view is that the insured paid about $270 to your client for the rental car, 80% of that. They then went back to the tortfeasor and said, we want $270. They said, we'll give you $70, and that's all you're going to get. That's right. And so they paid your client under the contract the 80%, and so no one was really made whole. That's correct. And the courts in California have not cut back on the proposition that before the insurer can go collect on its subrogation rights, the insured has to be made whole. The most recent pronouncement was Quintana. It's quoted at page 5 in our reply brief, and it says that subrogation in California, excuse me, the make-whole rule in California affects both reimbursement and subrogation. Both of those rights are limited by the make-whole rule. You're right. Nobody was made whole here. We needed to be made whole before they could have any of their subrogation money, and they could only keep the rest over and above that. They admit that in the case where there's a limited fund. California law doesn't so limit us to that. And the case that was relied on below, this Winkelman case from New York, is set against a very different template. You don't have the – there, you have exactly what you were talking about. The insurer's rights are limited to what he contracted for in the contract, and the insurer has no obligation once he's gotten back those rights. Winkelman is a very troubled case. I don't know if it had troubled childhood, but it's a troubled case. It starts by saying the very narrow issue presented here is do we have to wait? Does the insurer have to wait to go exercise his subrogation rights? We never said they have to wait. That is in our position. The court there said you don't have to wait because your claim might go stale, the statute of limitations could run. And I agree that it had some language in it about whether you needed to pay that money over. But that wasn't what the court was addressing. That's dictum, if you will. And I would suggest for a good analysis of this that the court read the dissent in this Mueller case. The Mueller case is cited at the State Farm Brief at page 32. It's a Wisconsin case. 4-3 decision, very close. And what Mueller said, and it's not a matter of California law, so California courts I think would be more convinced by that dissent. Because what it said was there is always a competition between the insured and the policyholder with regard to subrogation rights and being made whole. And in California the rule is clear that they can't compete, not just in the case where there's a limited fund. They can't compete with their insured. And that's exactly what the dissent, a very good dissent in Mueller said. It said you can't do that. You have to pay over the money if you go out and collect on your subrogation rights because your subrogation always goes below the insured being made whole. I would like to reserve a moment. Thank you. Just to start off, my name is Kevin Dunn. I represent State Farm. And if it may please the court, the case isn't ripe at this point, and for many reasons, and I think you've pointed out several of them. First of all, State Farm, all they went after was their subrogation rights. They did not go for the uninsured portion, and they didn't have the right to go for the uninsured portion. And the only time that the plaintiff is entitled to any kind of make whole is if the tortfeasor or the tortfeasor's carrier doesn't have enough insufficient funds. In this case, all that happened was the plaintiff made a phone call to the insurance company and said give me my money. No lawyer demanded the money. The plaintiff didn't write to the insurance company. Nobody called the insured himself to see if he had $60. When the lawyer got in the case, they didn't write a demand letter. They didn't even make a phone call. Basically what they've done is they've filed a class action, and we don't know if the class action is ripe because in this case, we don't know if the plaintiff is out any money. And they've got, they've still got time left. If they want to pursue the $60, they can pursue. Now, the plaintiff's attorney says we were competing with them, and you're not allowed to compete. In fact, we weren't competing because all we're going after is the subrogation amount. The plaintiff isn't entitled to that. They can't go after that. We can go after that. We're not going after their amount of money at all. So you're saying the plaintiff could still sue the tortfeasor for his remaining uncompensated? He could still do that. The 20% that State Farm didn't pay. Right. He could still do it. I mean, I would argue in this case, the low-hanging fruit is an allusion they like to make. It wasn't that low-hanging because I think we paid, State Farm paid out 200 and some odd dollars, $250. And the subrogation was $250, and the low-hanging fruit wouldn't give them $250. Why? Because arguably there's an issue over damages. There's an issue over various things, and that happens not infrequently. We're just talking right now about the cost of the rental car, right? Yes. And so you're saying that the tortfeasor was saying he had the car for too long or he paid too much for the car. Is that it? Yes, that was it. In other words, it's like we'd pay for a Ford, but he gets a Lamborghini, and he says pay for the Lamborghini, and the insurance company says, no, we'll pay you $35 a day, and that's all they would reimburse us even though we have a subrogation amount in excess of that. Counsel, if we were to adopt the plaintiff's theory, would that on the back side open your client to a lot of bad faith litigation, saying you failed to go after my uninsured portion, and therefore by not doing that and by failing to do that and unreasonably doing that, we're now going to sue you for bad faith, and it turns a $60 case into a huge tort action? That's what they want to do. That's what the class action is about. That's why they're doing that. Basically, if they were successful, they would eliminate subrogation and partial subrogation. So this is a diversity? This action is based on diversity? No. No? Yes. Is it based on diversity or not, jurisdiction? I'm not sure. It's a class action. Fairness. Yes, it's a Kappa case. It's a Kappa case. Okay. It is. Mr. Howarth argues that it would be simple for State Farm or for any insurer to write around the rule or any rule that we were to write. What is your response to that? My response to that is, number one, his idea, he apparently wants us to write around his version of the rule. In other words, he wants us to write and say, under no circumstances, we will always pay first. But now we won't pay first. Our view is, we're not opposed to the make whole rule when there's insufficient funds. So we don't want to write around the make whole rule. We think the make whole rule is a rule and a good rule when there's insufficient funds. So we're really not trying to write around anything. So his idea of, you would write around if, his idea is, first of all, we adopt his theory that the insured always has priority, and then we write around that and say the insured doesn't always have priority. But, in fact, we don't think the insured doesn't always have priority. It does have priority in some circumstances. So I don't think that's, furthermore, there's no policies that say that. You have to change millions of policies and basically change the law of subrogation to do what he wants to do. And I don't think it's good for society. I made a laundry list of why it's not good for public policy, but a lot of it's in the brief. But basically, just envision this. You buy a, you're the plaintiff in this case, and you buy a policy, and you get 80% is covered and 20% is not covered. And under Mr. Howarth's idea is we can't go, we can't make that phone call to try to get our subro back until we pay him off. We pay him 100%. And so who's ever, and he has this thing, he says, oh, it can be, all we have to do is either decide we're never going to exercise our subrogation rights or if we want to exercise our subrogation rights, we have to go through these various hoops to be able to do that. And I'm saying, who's going to do that? Very few people. And the result is going to be that most insurance companies are not going to go try to get the money from the tortfeasor, who's the actual party who's caused all of this. And every court in California and elsewhere says that one of the public policies is that tortfeasors should pay. And under his rewriting of the law, it's less likely that the tortfeasors should pay. And he says, well, you don't have any, what kind of evidence is this, empirical evidence to support that. Well, every case that we've cited says that, and it sounds like common sense to me, he doesn't have any empirical evidence to show the contrary, that this would be great for society, would be creating a situation in which the insureds get premiums for 80% but have to pay 100%. It's just not a feasible situation and it's bad. Oh, he calls Quintana. In Quintana, this is the California Supreme Court. Let me bring that up a minute. Yes.  The question is, how much data would ever be before the court at this point? The only you have to take what he says is true, but there's no evidence before the court in a motion to dismiss. So how do you back that out about either side having empirical data and a motion to dismiss? I back it out on the fact that the cases all say that. The cases do? Yes. I mean, basically, the cases all say they would cause double recovery. It would have all these impacts. And he says, don't listen to the cases. We need a mathematician in here. And so I'm relying on the cases, which, to me, make common sense and are the law. And he's saying you need empirical data. And that's what the court below said. And they're making its judgment exactly what you've said. Exactly. Exactly. But Quintana's most recent case, it's not exactly on point because it's a med pay case, so it's really a reimbursement versus a partial subrogation. But in the case, the plaintiffs wanted 100 percent of their med pay of they wanted 100 percent of what they paid the doctors, even though they weren't entitled to it under the contract and the policy. And the court says we can't rewrite these things. And if we do, what happens is we create the risk of double pay, and we make the benefits of these policies less accessible. And I think that's what would happen here. It would make the benefits of the policies less accessible if, in a case like this, you had to pay 100 percent when you can't even get subrogation for the full amount. So here they want 100 percent and us not to get, you know, get 30 cents on the dollar for subrogation. So that's all I have, Your Honor. Anything else? All right. Thank you, counsel. Mr. Howard. Thank you. Just three points, I think, Your Honors. First, I want to be clear that we're not opening the door to any new bad faith claims here. We are not asking for a rule that anyone must go after the tortfeasor or its insurer. What we say the rule is in California is that you may not go forward after the tortfeasor or its insurer and then keep those funds on your subrogation claim until your insured is made whole. And it's a privilege to sell insurance in California. That is not different than the application of the rule as it stands, as he admits it stands. The difference is this. He wants to limit your right to compete with your insured to those cases where you have insufficient funds established only. There is no California law that says a duty that an insurer has not to compete with its insureds is limited to those cases where there are insufficient funds. Would you please address the rightness argument? I couldn't hear you. Would you please address the rightness argument? Well, the rightness argument, everything as the court below said, rightness, standing, everything else, depends on the interpretation of the made whole rule. If we have a right to be made whole right now, it's right. If we don't, it's not right. So you only get to that by coming through the made whole rule. That's the key issue here, and on that issue hangs all of the rightness. There's no separate rightness issue. If we don't have the made whole rule, if we're not entitled to those funds now, there's no issue of rightness. And on this limiting to insufficient funds only, there's not only no California case on that, but that's exactly what this Mueller defense says, that Mueller dissent says. Joined in by three judges. It says you're competing for all the money that the other tortfeasor would pay. Exactly what he's saying here. You're competing with them for that small amount they would pay. If he wants to write around this, he can write around it by saying, we're with the made whole rule when it's insufficient funds, clearly, but otherwise we don't abide by the made whole rule. He can write that. And that, just to finish, is the only question, I think, at the end of the day, that this Court needs to answer is what would the California, if the California Supreme Court, would it or would it not enforce a policy of requiring insurance companies to clearly state to their policyholders whether or not they will have the made whole rule or to what degree. That's it. Thank you. Thank you, Mr. Howard. Thank you, counsel. The matter just argued will be submitted.
judges: McNamee, Rymer, Wardlaw